I agree that the facts and law in this case require the conclusion that Dana Corporation did not prove that plaintiff was discharged for misconduct or other fault, unrelated to the compensable injury, for which a non-disabled worker would ordinarily be terminated. I further agree that decedent did not constructively refuse suitable employment. And I agree that plaintiff is entitled to compensation from December 30, 1998, through at least January 5, 1999.
I disagree that decedent was capable of returning to full employment on December 30, 1998, January 5, 1999 or any other date up until the time of decedent's death on December 27, 2001.
Because the decedent admittedly told lies about his use of cocaine, the majority finds everything he says with respect to his inability because of pain to work subsequent to January 5, 1999, to be unworthy of belief. My human experience is that people will tell lies about some things and be truthful about others. I believe decedent told the truth about his injury and pain and that the pain prevented him from returning to full employment. Additionally, the lies decedent told about his cocaine use were not material to the outcome of this case, and he owned up to the lies while his employer did not come clean on its. Thus, in my view, plaintiff did not fail the credibility test. —
That same credibility test was failed miserably by Dana Corporation. When Dr. DuPuy released plaintiff to return to work with restrictions, Dana Corporation said it had no jobs available within the restrictions, nudging and leading its chosen physician to remove the restrictions so that plaintiff could return to work full time, full pay. Dana Corporation wanted plaintiff to return to work without restrictions so that it could claim that he returned to full duty, full pay. Once the plaintiff returned to work full duty, full pay, Dana Corporation could cease paying temporary total disability without seeking permission from the Industrial Commission. If plaintiff returned to work at limited duty, less pay, Dana Corporation would be required to pay temporary partial disability compensation. Its scheme was thwarted, however, because of a failure of communication. It did not communicate to its servicing agent that plaintiff's supervisor would be unavailable to fire him (and consequently plaintiff would not be invited to return to "work" for the firing) until he returned from his holidays on January 5, 1999. Thus when plaintiff tried to return to work on December 30, 1998, he was told to come back on January 5, 1999.
When plaintiff reported to work on January 5, 1999, Dana Corporation told him he was fired for violating Dana Corporation's drug policy. The majority found that to be untrue because the facts show that decedent did not violate the policy. The majority further found that Dana Corporation's authorized agent told an untruth when it filed a Form 28 with the Industrial Commission certifying that decedent had returned to full work, full pay, with Dana Corporation on December 30, 1998 and when it terminated his temporary total disability benefits improperly without Industrial Commission approval on that date.
To me, telling untruths to the Industrial Commission to avoid paying compensation owed is more reprehensible, and a greater offense to the spirit of the Workers' Compensation Act, than telling untruths about cocaine use. And, the worker should be given credit for confessing his untruths. There was no similar concession by Dana Corporation or its authorized agents.
Additionally, plaintiffs continued inability to work after January 5,
1999, due to the pain resulting from his compensable injuries was corroborated by independent evidence that should remove any doubt about the credibility of plaintiff's testimony on this issue. Dr. Ade Akande of Charlotte Pain Associates is a medical doctor specializing in pain management. Dr. Akande took a medical history and performed a physical examination of plaintiff on February 23, 1999. In his history, Dr. Akande wrote, "The pain is described as a constant pain, sharp in the lower back with occasional radiation to the posterior aspect of the right hip and right thigh. He admits to occasionally sharp shooting pain radiating down to his thigh and calf with intermittent episodes of numbness and tingling. Currently, the pain is rated as a 5-6/10 on the numerical pain scale. . . . He reports exacerbation of pain on bending, stooping down with the only relieving factors being lying supine for prolonged periods of time." In the FAMILY SOCIAL HISTORY section of Dr. Akande's report, he says, "He also reports additional complaints of insomnia secondary to back pain."
In his examination of plaintiff, Dr. Akande found no reason to disagree with the history given by his patient. In reporting his EXAMINATION OF THE LUMBAR SPINE, he wrote, "Remarkable for mild bilateral lumbar paravertebral muscle spasm with tenderness on palpation of the L4-5. L5-S1 and over the sacrum. A few trigger points are elicited." —
In reporting his NEUROLOGICAL EXAMINATION, he wrote, "Sensory examination of the lower extremities is slightly diminished bilaterally over the anterior aspect of the leg and dorsum of the foot. Goes on into the L4-5 and S1 dermatomal distribution."
His report ended:
IMPRESSION:
1. Low back pain — myofascial.
2. Peripheral neuropathy, probably secondary to diabetes.
3. Bulge in L5-S1 intervertebral disk.
PLAN:
1. Quantitative sensory test to determine degree of sensory loss and neuropathy/radiculopathy.
2. Multiple trigger point injections.
3. Will consider epidural steroid injection if trigger point therapy fails.
4. Will start on Daypro, two tablets qd
5. Return to clinic in approximately two weeks.
Thus, after the company doctor acceded to the company's request that the worker be released from medical care without restrictions, another qualified pain specialist believed plaintiff was still suffering to the extent that he needed sensory testing, multiple trigger point injections, an epidural steroid injection if trigger point therapy fails, and two Dapro (a nonsteroidal anti-inflammatory drug [NSAID] used to relieve inflammation, stiffness, and joint pain) tablets every day.
Additionally there is copious caselaw to the effect that the injured worker himself can give evidence as to the pain from his injury and its effect on his ability or inabilit y to work
This 28th day of August 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER